(159 App. Div. 365.)

POEL et al. v. BRUNSWICK–BALKE–COLLENDER CO. OF NEW YORK.

(Supreme Court, Appellate Division, First Department.   December 5, 1913.)

1. SALES (§ 52*)—ACTION FOR DAMAGES—SUFFICIENCY OF EVIDENCE.
    Evidence, in an action for breach of a contract to purchase rubber, *held* to sustain a finding that a memorandum of sale made out by plaintiff and sent to defendant did not contain a "strike clause" with reference to delivery, and that it was not rejected and returned by the purchasing agent on that account.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 118–144, 1045; Dec. Dig. § 52.*]

2. SALES (§ 52*)—BREACH BY PURCHASER—ACTION FOR DAMAGES—SUFFICIENCY OF EVIDENCE—CONTRACT.
    Evidence, in an action for damages for breach of a contract to purchase rubber, *held* to show that the minds of the parties met on the terms of the contract, as embodied in a memorandum of sale made out by plaintiff, and sent to defendant's purchasing agent, which gave the price, time of delivery, etc.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 118–144, 1045; Dec. Dig. § 52.*]

3. PRINCIPAL AND AGENT (§ 161*)—REPUDIATION OF AUTHORITY.
    If a certain agent was authorized to represent defendant in contracting to purchase rubber from plaintiff, or was estopped to deny his authority, a letter by defendant's vice president, written after the contract was made, repudiating such person's authority, would not affect the contract.
    [Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 614–618; Dec. Dig. § 161.*]

4. SALES (§ 52*) — ACTIONS FOR DAMAGES — SUFFICIENCY OF EVIDENCE — CONTRACT.
    Evidence, in an action for breach of contract to purchase rubber, *held* to show that a letter, written by defendant's vice president to plaintiff, repudiating a contract for the purchase of rubber made by one of defendant's employés, related to the contract involved.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 118–144, 1045; Dec. Dig. § 52.*]

5. FRAUDS, STATUTE OF (§§ 107, 113*)—CONTRACTS OF SALE.
    To comply with the statute of frauds, a memorandum of the purchase of goods must give the names of the parties and state all the terms of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

contract with reasonable certainty, either in itself or in some other writing referred to therein, without the aid of parol evidence.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 212, 213, 239–241; Dec. Dig. §§ 107, 113.*]

6. FRAUDS, STATUTE OF (§ 118*)—SALE OF GOODS—SUFFICIENCY OF MEMORANDUM.

After parol negotiations for the purchase of rubber by defendant acting through R., plaintiff executed an instrument dated and headed "Contract" and addressed to defendant's name and address, which read: "Sold to You: For equal monthly shipments January to June, 1911 * * * about twelve tons Upriver Fine Para rubber at $2.42 per pound * * * cash twenty days from date of delivery." Thereafter defendant, by its vice president, wrote to plaintiff a letter stating that defendant's attention had been called to the transaction relating to the 12 tons of rubber, and that R. had no authority to effect such transaction for defendant, and that it did not recognize the transaction or any others entered into by R. without authority. Held, that if R., in fact, had authority to make the contract, the memorandum of sale, when taken with defendant's letter of attempted repudiation, constituted a sufficient memorandum of sale within the statute of frauds.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 199, 262–265; Dec. Dig. § 118.*]

7. PRINCIPAL AND AGENT (§ 137*) — EXISTENCE OF RELATION — ESTOPPEL TO DENY AUTHORITY.

Plaintiff had been previously referred, by one of defendant's executive officers, to R. as defendant's purchasing agent, and R. and plaintiff had negotiated several contracts for the sale of rubber to defendant without knowledge that special authority was conferred upon R. in each particular instance to make the purchase, and defendant accepted and paid for such goods under the contracts, and also received and retained the present contract for 12 tons of rubber, made by plaintiff with R., although the sale was not for immediate delivery, and did not attempt to repudiate R.'s authority to make the contract until the market price of rubber had materially decreased, at which time plaintiff loaded the rubber ready for shipment and lost other opportunities for sale. Held, that defendant was estopped from denying R.'s authority to make the contract for the purchase of the twelve tons of rubber.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 492–494; Dec. Dig. § 137.*]

8. SALES (§ 374*)—BREACH OF CONTRACT—REMEDIES OF SELLER—DAMAGES.

Upon the repudiation of a contract of purchase in toto by refusal to receive the goods, the seller was entitled to sue at once for damages for breach of the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1091; Dec. Dig. § 374.*]

9. SALES (§ 384*)—MEASURE—BREACH OF CONTRACT.

The measure of damages for refusal to receive goods purchased is ordinarily the difference between the contract price and the market price at the time of delivery, unless the seller elects to hold the goods and sell them on the purchaser's account, when the measure would be the difference between the contract price and the best obtainable price at the time of sale.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1098–1107; Dec. Dig. § 384.*]

10. SALES (§ 370*)—BREACH OF CONTRACT—REMEDIES OF SELLER—ELECTION.

That the seller, after the purchaser of rubber had refused to receive the first shipment, offered when each shipment arrived to give the purchaser an opportunity to withdraw its repudiation and accept the shipment, was not an election by the seller to treat the purchaser as the owner of the

rubber and hold and sell it for the purchaser's account, so as to waive the breach and elect to sue for the difference between the contract price and the highest price obtainable at the time of sale.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1085; Dec. Dig. § 370.*]

11. APPEAL AND ERROR (§ 1068*)—HARMLESS ERROR—MEASURE OF DAMAGES.

Where the recovery in an action for breach of contract for refusal to receive rubber purchased, by measuring the damages as the difference between the contract price and market value at delivery, was for a less amount than it would have been if the damages were measured by the difference between the contract price and the price received by the seller on resale, any error in taking the former measure of damages was not prejudicial to the purchaser.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4225–4228, 4230; Dec. Dig. § 1068.*]

Appeal from Trial Term, New York County.

Action by Frans Poel and another, partners as Poel & Arnold, against the Brunswick-Balke-Collender Company of New York. From a judgment for plaintiffs, defendant appeals. Affirmed.

See, also, 78 Misc. Rep. 311, 139 N. Y. Supp. 602.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, SCOTT, and HOTCHKISS, JJ.

Irwin Untermyer, of New York City (Samuel Untermyer, of New York City, on the brief), for appellant.

Aaron C. Thayer, of New York City (George M. Pinney, of New York City, on the brief), for respondents.

LAUGHLIN, J.    This is an action to recover damages for the breach of an executory contract for the purchase by the defendant of about 12 tons of Upriver Fine Para rubber. The principal questions litigated on the trial and presented for review by the appeal are with respect to whether the plaintiffs established a contract valid within the statute of frauds, and authority of defendant's agent to make the contract, and concerning the measure of damages.

The plaintiffs were copartners engaged in the business of importing and dealing in crude rubber; and the defendant was a domestic corporation engaged in the business of manufacturing and selling, among other things, billiard tables. The defendant had manufacturing plants at Long Island City, N. Y., Chicago, Ill., and Muskegon, Mich.; but the billiard tables were made only at the factory at Muskegon, and all of the rubber purchased by it was used at that place. Its principal office was in Chicago, but it had a branch office in the borough of Manhattan, New York. One Kelly represented the plaintiffs' firm in selling rubber, and on its part conducted the negotiations with respect to purchasing the rubber in question. The defendant had in its employ in its purchasing department one Rogers, who had an office at the Long Island City factory, and represented the defendant in purchasing raw material. Rogers negotiated seven prior purchases of rubber by the defendant from the plaintiffs' firm, through its said agent, the first of which was made on the 24th day of November, 1909, and the last on the 31st day of March, 1910. Kelly and Rogers

had on the former occasions conducted their negotiations, in part at least, over the telephone.

On Saturday, the 2d of April, 1910, negotiations for the purchase of the rubber in question were opened by a conversation between Kelly and Rogers over the telephone. It does not appear which called up the other, but it would be a reasonable inference from the testimony of Kelly that he called Rogers, for he says he informed Rogers that he had a certain number of tons of rubber to sell and asked if he "could sell him any rubber," and in answer to the inquiry Rogers inquired how the market was. The evidence with respect to the parol negotiations leading up to the alleged contract in writing is uncontroverted. Kelly says that, after informing Rogers about the state of the market and the kind of rubber his firm had for sale, Rogers inquired concerning the ability of plaintiffs' firm to deliver rubber the following year, and Kelly replied, in substance, that it could sell rubber "for January-June, equal monthly shipments for Upriver Fine Para rubber, at probably $2.42 a pound," shipments to be made from either Brazil or Europe; that Rogers then asked Kelly's opinion with respect to the future course of the market, and was advised that Kelly thought it was going up, whereupon Rogers inquired whether Kelly could get the rubber for him "at once," and was informed, in substance, that Kelly could not say definitely until he received cables on the following Monday morning; that thereupon Rogers said "he would take twelve tons of rubber for equal monthly shipments from Brazil or Europe at $2.42," the rubber to be Upriver Fine Para rubber, and Kelly was to communicate with him on the following Monday. After this conversation, and on the same day, Kelly prepared a letter, which was signed in the name of plaintiffs' firm by him and mailed to the defendant, addressed to it at Long Island City, on the same day. That letter was produced on the trial by the defendant, and is as follows:

"Poel & Arnold, 277 Broadway.

"New York, April 2, 1910.

"Brunswick-Balke-Collender Co., Long Island City, L. I.

"Gentlemen: As per telephonic conversation with your Mr. Rogers to-day, this is to confirm having your offer of $2.42 per lb. for 12 tons Upriver Fine Para rubber, for shipment either from Brazil or Liverpool, in equal monthly parts January to June, 1911, about which we will let you know upon receipt of our cable reply on Monday morning.

"Thanking you for the offer, we remain

"Very truly yours,        Poel & Arnold, per W. J. Kelly."

There was no further communication between the parties, or their representatives, until Monday, April 4, 1910, when Kelly, after receiving cables from London—cables from Brazil sometimes came to plaintiffs' firm by way of London, but it does not appear whether or not any of these cables emanated from Brazil—dictated a memorandum to a stenographer, which was written out, and the original was signed by one of the plaintiffs in the name of the firm and inclosed with a letter to the defendant that day, and a carbon copy was pasted in the book of orders or contracts kept by plaintiffs' firm. The letter inclosing the memorandum was likewise addressed to the defendant at Long Island City, and the body of it was as follows: ,

"Inclosed, we beg to hand you contract for 12 tons Upriver Fine Para rubber, as sold you to-day, with our thanks for the order."

The original memorandum, designated "Contract," inclosed with the letter, was not produced on the trial; but the carbon copy, without signature, was received in evidence as Exhibit 3 and will be so referred to for brevity. It is as follows:

"Contract.

"Apr. 4/10.

"K-W

"Brunswick-Balke-Collender Co., Long Island City, L. I.

"Sold to You: For equal monthly shipments January to June, 1911, from Brazil and/or Liverpool, about twelve (12) tons Upriver Fine Para rubber at two dollars and forty-two cents ($2.42) per pound; payable in U. S. gold or its equivalent, cash twenty (20) days from date of delivery here."

It was admitted that the letter and inclosure were received by the defendant. The letter was either opened by Rogers, or it and the inclosure were delivered to him, for, after examining the inclosure, he filled in one of the defendant's blank order forms, under date of April 6, 1910, and on that day mailed it to the plaintiffs. It was received in evidence as Exhibit 4. This form of order, by a printed memorandum at the top, indicated that it was given by the purchasing department of the defendant, and opposite the words "Order No." were printed in red ink the figures "25409." Underneath this there was a printed direction to the effect that that number must appear on all invoices and cases. To the left at the top there appeared in large type the name of the defendant and its Long Island City address. Next came the date, and after that, in the blank space for the name of the person to whom the order was addressed, Rogers filled in the name of the plaintiffs' firm with its address. He then inserted, under a direction in print to "please deliver at once the following, and send invoice with goods," the following:

"About 12 tons Upriver Fine Para rubber at 2.42 per lb. Equal monthly shipments January to June, 1911."

Immediately under this blank space thus filled in by Rogers, and to the right, was a printed subscription, as follows:

"Respectfully yours,
"The Brunswick-Balke-Collender Co. of New York,
"Per ————."

Under this subscription, opposite the word "per," Rogers wrote his name. To the left of this subscription, the following appeared in comparatively fine print, with the exception of the first line which was in larger type than the rest, viz.:

"Conditions on which above order is given:

"Goods on this order must be delivered when specified. In case you cannot comply, advise us by return mail stating earliest date of delivery you can make, and await our further orders.

"The acceptance of this order which in any event you must promptly acknowledge will be considered by us as a guarantee on your part of prompt delivery within the specified time.

"Terms.........................F. O. B...................."

The testimony of Rogers shows that, in filling in Exhibit 4, he followed the terms of the sale as specified in the original of Exhibit 3, and that the omissions, which were merely with respect to the place from which the rubber was to be shipped and the terms of payment, were unintentional and accidental. Rogers also testified that he returned to the plaintiffs with Exhibit 4 the original of Exhibit 3. This testimony was controverted by evidence given in behalf of the plaintiffs. Rogers assigned, as a reason for returning it, that it contained a clause relieving the plaintiffs from liability for delays in delivery in case of strikes "and some other memorandum of that kind." Kelly testified that the form of contract which the plaintiffs' firm usually sent to its customers with respect to the purchase of rubber, at and prior to that time, contained a note as follows:

"Note: This contract contingent upon strikes, accidents, or other causes beyond our control."

He, however, testified, "We did not always put on our writings this strike clause," and that it was not on the original of Exhibit 3, and that, if it had been, it would have been shown on the carbon copy, Exhibit 3. It is fairly to be inferred from Kelly's testimony that, if the strike clause was omitted from the original of Exhibit 3, the omission was by mistake, for he conceded that long prior to that time, the plaintiffs' firm had inaugurated the practice of inserting such a clause, and it appears by his testimony that the only reason he was able to say that it was not inserted in this instance is that it is not contained in the carbon copy. If the strike clause was on the original of Exhibit 3, that would render the testimony of Rogers, to the effect that he returned the paper, probable. It is not probable, however, that the original contained any typewriting not found in the carbon copy, and it would seem that if Rogers, by sending Exhibit 4, intended to reject the original of Exhibit 3, he would have notified the plaintiffs' firm by letter or message to that effect. One of the plaintiffs, whose initial appears on the carbon copy, testified that, according to his usual custom, he compared Exhibit 3 and the original, and thereupon initialed the carbon copy, and that the original did not contain a strike clause. Three of the four individuals who, in the usual course of business might have received Exhibit 4 for the plaintiffs' firm, gave testimony tending to show that the original of Exhibit 3 was not returned. One of the plaintiffs, who might have received it, was absent in Europe and did not testify. It appears, however, that in the usual course of business it would have reached the hands of Kelly had it been returned. None of the prior contracts between the parties contained a strike clause which with other evidence tends to show that it was not inserted in contracts for this quality of rubber.

[1] This evidence presented a sharp issue of fact with respect to whether the original of Exhibit 3 contained a strike clause, and whether it was rejected and returned by Rogers. The trial court had the advantage of seeing the witnesses, and we would not be justified in reversing his finding and finding the other way, and we do not think that the evidence renders the correctness of the finding made sufficiently doubtful to require a new trial.

The plaintiffs, on receiving Exhibit 4, appear to have regarded it as a confirmation of the contract submitted by them.    They filed it away after making a notation on Exhibit 3 of the defendant's order number for the purpose of complying with its request to have said order number appear on the invoices and cases.    There were, as already stated, parol negotiations between Rogers and Kelly with respect to the seven prior separate sales of rubber by the plaintiffs to the defendant; and in each instance the plaintiffs, after such negotiations, forwarded to the defendant contracts in the same form as the original of Exhibit 3, and without the so-called strike clause; and, with respect to five of them, Rogers upon receiving such contracts forwarded to the plaintiffs orders for the goods on the same printed blank form as that used in this instance, with the exception that one of such orders covered the purchases embraced in two of the contracts transmitted by the plaintiffs' firm.    The record does not show whether or not Rogers communicated with plaintiffs after receiving the contracts from them for the other two prior purchases.    In each of the four memorandums like Exhibit 4 which Rogers so sent to plaintiffs, he omitted the terms of credit as he did in this instance.    It was conceded that the rubber embraced in those contracts was delivered to the defendant pursuant to the terms of the contracts as thus made and paid for by it.    There is no evidence on the question as to whether on said former occasions the plaintiffs sent any further communication to the defendant after receiving said orders from Rogers; but it is a reasonable inference from all of the evidence that the parties considered the contracts then closed without further negotiations or communications.

[2] Accepting, therefore, as we do, the findings of the trial court that the original of Exhibit 3 did not contain the strike clause, and that Rogers did not return it with Exhibit 4, and assuming that Rogers had authority to negotiate the contract for the defendant, it would seem that the minds of the parties had met on the terms of the contract contained in the original of Exhibit 3, and that the clause in fine print on Exhibit 4 to the left of the subscription was not intended to call for an acceptance, particularly in view of the former transactions between the parties, which distinguishes the case from Hough v. Brown, 19 N. Y. 111, wherein it was held that a party who stated the terms of a contract, negotiated by parol, in a letter written to the other party, saying that he accepted them and requesting the party to whom the letter was addressed to accept his letter in writing, was not binding upon the writer of the letter in the absence of an acceptance thereof in writing.    The inadvertent omission by Rogers from Exhibit 4 of the place from which the rubber was to be shipped, at most, would have given the plaintiffs' firm a greater latitude with respect to the point from which shipment was to be made; and his inadvertent omission of the 20 days' credit after delivery would, at most, have left the time of payment to be implied by law which would have been less favorable to defendant.

Although Exhibit 4 contains no reference to the original of Exhibit 3, it is perfectly clear from the evidence that the two papers relate to the same transaction and were intended to embody the same contract.

It is not, however, necessary to decide whether the original of Exhibit 3 and Exhibit 4 taken together would constitute a sufficient note or memorandum of the contract signed by the defendant within the statute of frauds, for the record contains another item of evidence consisting of a letter written by the defendant to the plaintiffs' firm on the ·7th day of January, 1911, which supplies any omission. That letter is as follows:

"We beg herewith to advise you that within the past few weeks there has come to our attention through a statement made to us for the first time by Mr. Rogers, information as to certain transactions had by him with you in the past, and especially as to a transaction in April last relating to 12 tons of crude rubber. Mr. Rogers had no authority to effect any such transaction on our account, nor had we any notice or knowledge of his action until he made a voluntary statement disclosing the facts within the past few weeks. In order that you may not be put to any unnecessary inconvenience, we feel bound to give you notice at the earliest opportunity after investigating the facts, that we shall not recognize these transactions or any others that may have been entered into with Mr. Rogers which were without our knowledge or authority."

[3] This letter was signed in the name of the defendant "Per Chas. P. Miller, Vice Prest." · If Rogers was authorized to represent the defendant, or plaintiffs were led to believe he was, the provisions of this letter, by which it attempted to repudiate his authority, were, of course, ineffective. The defendant at that time, at least, was chargeable with knowledge of the correspondence and contracts which Rogers had theretofore had and negotiated for it, and of the correspondence he had had with respect to this transaction, and of the original of Exhibit 3 which he then held for it. The letter clearly recognizes that a transaction had been effected between Rogers and the plaintiffs for the purchase of 12 tons of rubber. The defendant merely disclaimed Rogers' authority to effect it. The only transaction he had with the plaintiffs with respect to the purchase of such rubber during the month to which the letter relates, on the assumption that the original of Exhibit 3 did not contain the strike clause and that it embraced all the terms of the contract previously negotiated, as shown by the uncontroverted evidence, was the negotiation of the contract embodied in the original of Exhibit 3.

[4] It is to be borne in mind that the defendant held the contract signed by plaintiffs, and there is in such case no danger of opening the door to fraud or perjury by construing defendant's letter as relating to the contract which is executed in a manner to bind plaintiffs. See Newton v. Bronson, Ex'rs, 13 N. Y. 587–595, 67 Am. Dec. 89.

[5, 6] We recognize that the authorities hold that the note or memorandum, to constitute a compliance with the statute, must give the names of the parties and state all the terms of the contract with reasonable certainty, either in itself or in "some other writing or thing" referred to therein, and without the aid of evidence of parol negotiations. Mentz v. Newwitter, 122 N. Y. 491, 25 N. E. 1044, 11 L. R. A. 97, 19 Am. St. Rep. 514; Ward v. Hasbrouck, 169 N. Y. 407, 62 N. E. 434; Brauer v. Oceanic Steam Navigation Co., 178 N. Y. 339, 70 N. E. 863; Wilson v. Lewiston Mill Co., 150 N. Y. 314, 44 N. E. 959, 55 Am. St. Rep. 680; Evans v. Pelta, 146 App. Div. 749, 131 N.

Y. Supp. 411. But we do not deem it an extension of that doctrine to hold that on these facts the defendant admitted by its letter of January 7, 1911, that the contract evidenced by the original of Exhibit 3, which it was competent to identify by parol evidence as has been done, had been negotiated between the defendant's agent, Rogers, and the plaintiffs, and, on that theory, notwithstanding the fact that the letter was written for the purpose of repudiating liability, it, taken with the original of Exhibit 3, constitutes a sufficient memorandum signed by the defendant within the statute of frauds. Raubitschek v. Blank, 80 N. Y. 478; Thompson v. Menck, 4 Abb. Dec. 400; Beckwith v. Talbot, 95 U. S. 289, 24 L. Ed. 496; Smith v. Colby, 136 Mass. 562; Cave v. Hastings, L. R. 7 Q. B. D. 125; Long v. Miller, L. R. 4 C. P. D. 450.

On the question of Rogers' authority to represent the defendant, there is evidence in addition to that with respect to the former purchases of rubber of the plaintiffs by the defendant through him. Kelly testified that prior to such purchases he talked with one Troescher, the secretary and treasurer of the defendant, whose headquarters were at the New York office, and who alone signed the checks in payment of the rubber subsequently purchased, "about rubber"; that Troescher asked him from time to time concerning the state of the market, and said "that Mr. Rogers would do the buying of the rubber"; and that thereafter contracts were negotiated through Rogers. Mr. Arnold, one of the plaintiffs, testified that prior to any of the purchases he had several conversations with Troescher with respect to news concerning the rubber market, and that Troescher informed him "that Mr. Rogers did the buying for the company." The defendant gave evidence tending to show that Rogers did not have general authority to purchase rubber for it, and that the purchases he made were authorized in each instance by its Chicago office. On cross-examination, Kelly answered a question, as to whether the defendant had ever given him reason to suppose that Rogers had authority to purchase rubber on his own responsibility, in the negative. On that testimony, the learned counsel for the appellant argues that Kelly knew that Rogers had no authority to purchase rubber, excepting when specially authorized. After so testifying, however, Kelly further testified, in effect, that he was led to believe that Rogers was the general purchasing agent of the defendant by the fact that the defendant had instructed him to sell rubber to the defendant through Rogers, and further stated that this was based on the fact that prior to making any of the contracts he met Troescher, Rogers, and one Shank, who was the superintendent of defendant's factory at Muskegon where the rubber was used, at the defendant's office, and was then instructed "that Mr. Rogers would do the buying" for the defendant.

There was also evidence that, prior to the transaction in question, Rogers had made four contracts with the New York Commercial Company for the defendant for the purchase of fourteen tons of rubber, all of which were for somewhat remote future deliveries, and that this rubber was received and paid for by the defendant. It does not appear, however, that the plaintiffs had knowledge of, or relied upon, the

making of those contracts. There is also evidence that Rogers made contracts for the purchase of about 40 tons of rubber for the defendant during the year 1910. The evidence with respect to the purchase of rubber from the New York Commercial Company, and the subsequent purchases of rubber for the defendant, and with respect to the correspondence had in the name of the defendant by Rogers, tends to impeach the evidence offered in behalf of the defendant to show that Rogers' only authority to represent it in purchasing rubber was such as was specially conferred from time to time. It is not, however, necessary to decide whether the evidence is sufficient to show that Rogers was the defendant's general agent for purchasing rubber or to require a finding to that effect, for it satisfactorily appears that the plaintiffs were led to believe, by the course of business between them and the defendant, that Rogers was authorized to contract in its name for the purchase of rubber whenever in his judgment it seemed for the best interests of the defendant so to do.

It is fairly to be inferred that the defendant placed Rogers in charge of its purchasing department at the Long Island City factory. It furnished him with printed letter heads and order blanks for purchasing goods in its name, and suffered or permitted, if it did not authorize, him to use the same in negotiating and making contracts for it. Presumably its records and letter files, or letter press copies of letters written by Rogers, would show the business which he assumed to transact in its name, and the manner in which he transacted it. It is chargeable with knowledge of the contents of the records, papers, and files kept in its office for it, by its agent, at least, after the lapse of a reasonable time, within which to examine them. It is, of course, not chargeable with knowledge of any negotiations he had with respect to the purchase of rubber for it, which it did not authorize, and which rested in parol; but it is chargeable with knowledge of the fact that he negotiated this contract, for he received and retained for it the letter confirming the negotiations, and the letter inclosing the contract, and the contract, being the original of Exhibit 3; and it is chargeable with knowledge of the fact that its records show that he sent the plaintiffs Exhibit 4, for it was taken from one of its order stubbooks and a duplicate copy of Exhibit 4 was made on the stub.

[7] It may be that the secretary and treasurer of the defendant was not authorized to speak for it with respect to the authority conferred upon Rogers to represent it in purchasing rubber, and it may be conceded that the defendant could have repudiated the first contract which Rogers negotiated, if not specially authorized by it; but when the plaintiffs were referred by one of the executive officers of the defendant, in charge of its New York office, to Rogers as the purchasing agent of the defendant, and they negotiated successive contracts with him without notice or knowledge that special authority was conferred in each instance, and the defendant accepted and paid for all goods delivered under those contracts, when the defendant received and retained this contract, together with the correspondence, although it was for a considerably larger quantity of rubber than Rogers had theretofore purchased, and was not for immediate delivery, and made no at-

tempt to repudiate it until the market price of rubber had materially fallen, and until the plaintiffs must have lost other opportunities for selling or have incurred obligations relying on the contract and time for delivery of part of the rubber had arrived, and when it is fairly to be inferred that it had been loaded or was ready to be loaded for shipment—it is too late for the defendant to be heard to question Rogers' authority to make the contract. See Bliss v. Sherrill, 24 App. Div. 280, 49 N. Y. Supp. 561; Lowenstein v. Lombard, Ayres & Co., 164 N. Y. 324, 58 N. E. 44; Sloss Iron & S. Co., v. Jackson Iron Works, 103 App. Div. 316, 92 N. Y. Supp. 1056; Olcott v. Tioga R. R. Co., 27 N. Y. 546, 84 Am. Dec. 298; Glor v. Kelly, 49 App. Div. 617, 63 N. Y. Supp. 339, affirmed 166 N. Y. 589, 59 N. E. 1123; Mechem on Agency, § 282; Story on Agency (8th Ed.) § 256.

The remaining question relates to the measure of damages. The first shipment of a little more than two tons of rubber arrived at the port of New York on the 24th of January, 1911, and the defendant refused to accept it. It was then sold on January 26, 1911, at the market price. The plaintiffs thereupon elected to regard the action of the defendant in writing the letter of January 7, 1911, and in rejecting the tender of delivery, as a total breach of the contract, and on February 1, 1911, they commenced this action.

[8, 9] The repudiation of the contract in toto by the defendant gave rise to a cause of action in favor of the plaintiffs at once for their damages, which ordinarily, and therefore presumably, would be measured by the difference between the contract price and the market price at the time and place of delivery. Windmuller v. Pope, 107 N. Y. 674, 14 N. E. 436, fully reported 12 N. Y. St. Rep. 292; Todd v. Gamble 148 N. Y. 382, 42 N. E. 982, 52 L. R. A. 225; Saxe v. Penokee Lumber Co., 159 N. Y. 371, 54 N. E. 14; Brown v. Muller, L. R. 7 Ex. Cases 319.

That is the theory on which the plaintiffs have recovered. It is not questioned that the plaintiffs would have had a right to recover on that theory; but it is claimed that they waived such right and irrevocably made an election to hold the rubber as the property of the defendant, and thereby limited their right to recover to another measure of damages. It is conceded that the first shipment was sold at the market price. The damages for the rubber shipped in the succeeding months were determined by the market value of the rubber on arrival in New York as if it had been shipped on the last day of each of the five months succeeding January, on the theory that the plaintiffs had the entire month within which to make the shipment. The defendant showed by the examination of Kelly, recalled as a witness on its behalf, that the plaintiffs received rubber of the kind specified in the contract, and corresponding with the quantity called for by it, at New York in each of the five months succeeding January, and that on the arrival of the rubber they tendered delivery to the defendant, specifying in the case of the February shipment that it was tendered as a delivery under the contract, and in the case of the other shipments stating in the tender that it would have been applicable under the contract but

for defendant's failure and refusal to perform it, and in each instance gave the defendant notice that if not accepted they would sell the rubber at the best price obtainable; and in the case of the February shipment, but not with respect to the subsequent shipments, that they would hold the defendant responsible for any damages sustained by the breach of its contract. In each instance they also gave the defendant notice shortly after its failure to accept the shipment that they had sold the rubber and the price received therefor, and also drew attention to the contract price. The defendant also offered in evidence all the notices given to it by the plaintiffs with respect to the January shipment and the first notice given to it by plaintiffs with respect to the subsequent shipments. The plaintiffs then offered in evidence the correspondence showing the other notices they gave the defendant concerning the sale of the other rubber; but they did not otherwise show the price received for the rubber, or as to whether or not it was the best price obtainable.

The learned counsel for the appellant insists that this evidence, in view of the allegations of the complaint, shows an election on the part of the plaintiffs to hold and sell the rubber for the account of the defendant, in accordance with the rule well stated in Ackerman v. Rubens, 167 N. Y. 405, 60 N. E. 750, 53 L. R. A. 867, 82 Am. St. Rep. 728, which would confine the recovery to the difference between the contract price and the best price obtainable at the time of the sale, and that they failed to show by competent evidence that they received the best price obtainable in the market, and that therefore they were not entitled to recover, either on the theory on which recovery was had or under the rule applicable to sales for the account of the purchaser. The plaintiffs alleged that on the arrival of the first shipment they notified the defendant of arrival and requested "shipping or other instructions as to said rubber," and that in the event they did not receive such instructions "they should be obliged to conclude that the defendant adhered to its repudiation" of the contract stated in its letter of January 7, 1911, and would sell the rubber at the best price obtainable, and "would hold the defendant liable for all damage of every kind that its breach" of the contract caused to them, and that defendant failed to comply with their request and they sold the rubber at $1.27 per pound which was the market value and price on the day the sale was made. The plaintiffs did not expressly represent to the defendant that they would sell, or had sold, the rubber for its account. In each instance, they gave it an opportunity to take the rubber if it so desired. If the plaintiffs' damages are measurable by the difference between the contract price and the price received, and the price which the plaintiffs received had been shown to be the best price obtainable, the recovery would have been for a larger amount. It is, however, true, as contended by the learned counsel for the appellant, that the plaintiffs did not show that the prices which they received for the rubber were the best prices obtainable at the times of the sales; nor does the record show the market prices at those times— with the exception of the sale on May 17th, which was for six cents

less than the market price—from which an inference that they were the best prices obtainable might be drawn.

We are of opinion, however, that the recovery may be sustained on the theory adopted by the learned trial court. The rubber was shipped from Brazil. The ordinary time in transit from one port in Brazil from which the rubber was shipped was 17 days, and from another 13 or 14 days. The first shipment arrived on a steamer which sailed from both ports; but it does not appear at which port it was loaded. If at the nearest port, the steamer must have sailed as early as the 10th or 11th of January, 1911, or within about two or three days of the receipt by the plaintiffs of the letter repudiating the contract; and, if at the other port, on or before the date of such receipt. It is fairly to be inferred, with respect to that shipment, that, if the rubber had not been loaded at the time of the receipt of said letter, arrangements therefor had been made. As already observed, that shipment was sold at the market price. It is perfectly plain that the plaintiffs were entitled to recover the difference between the contract price and the market value at the time that shipment arrived, for they must have arranged to ship it at that time before receiving notice of the repudiation.

[10] The fact that they afforded the defendant an opportunity to withdraw its repudiation of the contract and to take the rubber did not, I think, constitute an election on the part of the plaintiffs to treat the defendant as the owner of the rubber, and to hold and sell it for its account. The plaintiffs at most offered as to each shipment to waive the breach and let defendant have the rubber. That was not, in the absence of acceptance by defendant, an election to waive the breach for which this action was pending. See Nichols v. S. S. Co., 137 N. Y. 471–485, 33 N. E. 561. The plaintiffs promptly brought suit, and before it was tried the time for delivery had passed, and they proved the market value in each instance save the first, on the last day on which they would have had a right under the contract to deliver. The defendant took no action with respect to the various notices given to it by the plaintiffs, and therefore its present contention that the plaintiffs elected to hold and sell the rubber for its account is without force, and is entitled to but little consideration. The defendant was not prejudiced by having been afforded an opportunity to take the rubber, nor by having been notified that the plaintiffs would sell the rubber and hold it responsible for the damages, nor by the notices of the amounts realized on the sales.

[11] The plaintiffs doubtless, in order to minimize their damages, were obliged to forward the rubber to this market and dispose of it. It may be further observed that, although the plaintiffs did not technically show that they obtained the best prices they could, or the market prices, for the rubber, it is highly probable that they did, for presumably they would have preferred cash to an uncertain claim against the defendant; and, as already observed, the recovery has been for an amount somewhat less than it would have been if the damages had been measured by the difference between the contract price and the price received by the plaintiffs on the sale of the rubber. We

therefore find no error to the substantial prejudice of the defendant. It follows that the judgment should be affirmed, with costs.

McLAUGHLIN, SCOTT, and HOTCHKISS, JJ., concur. IN-GRAHAM, P. J., concurs in result.