**TRANSIT ADVERTISERS, Inc. v. NEW
YORK, NEW HAVEN & HART-
FORD R. CO.**

No. 118, Docket 22183.

United States Court of Appeals
Second Circuit.

Argued Dec. 13, 1951.

Decided March 12, 1952.

908

Donovan, Leisure, Newton, Lumbard & Irvine, New York City (Granville Whittlesey, Jr., New York City, of counsel), for plaintiff-appellee, appellant.

Edward R. Brumley, New York City (James D. O'Neill, Robert K. McCullen, New York City, of counsel), for defendant-appellant, appellee.

Before CHASE, CLARK and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff, a New York corporation, sued the defendant, a corporation organized under the laws of Connecticut, Massachusetts and Rhode Island which maintains an office in the City of New York and operates a railroad in all of the states mentioned, for a declaratory judgment to determine whether an alleged oral contract between the parties had been made and, if so, was enforceable. The court held that the contract had been made, that it was enforceable, that it had been breached by the defendant and awarded the plaintiff damages for the breach. From that judgment the defendant has appealed. The plaintiff has appealed also from the judgment, but solely on the ground that the damages are inadequate.

The relevant facts, proved by adequate evidence, were found substantially as follows: On December 31, 1935, the plaintiff and the defendant executed a written contract under which the plaintiff was given the exclusive right for five years, and from year to year thereafter unless notice of termination, as provided for in the contract was given, to display advertising on the defendant's rights of way, stations and cars. Both parties performed but on December 13, 1947, the defendant, pursuant to the provisions of the contract, gave the plaintiff notice that it elected to terminate the contract as of December 31, 1948 and that it was ready to receive bids for the advertising concession with the locations and type of advertising to be at its discretion under a contract to become effective on January 1, 1949 and to be "subject to one year's termination notice." The plaintiff submitted a bid on April 30, 1948 and at least one other party bid for the concession. Authorized representatives of the plaintiff and defendant discussed the plaintiff's bid and, on June 7, 1948, these representatives met at New Haven, Conn., where they orally agreed to a renewal of the 1935 contract on terms which covered all essential matters concerning the display of advertising for a five-year period. By this agreement they intended to bind their principals at once although it was also agreed that the terms should later be reduced to writing. The legal department of the defendant was instructed to put the agreement in writing and prepared a draft which was submitted to the plaintiff's president. After his suggestions for changes to make it conform more precisely to the oral agreement were complied with, he signed two duplicate originals. These were submitted to a vice-president of the defendant, authorized to

sign it, who was satisfied that they conformed to the provisions of the oral agreement and accordingly signed them on August 9, 1948. One of these originals was to be sent to the plaintiff but, within an hour after the defendant's vice-president had signed them, he was instructed by the president of the defendant to cross out his signature upon each because the management of the railroad had been changed and the new management did not want to accept a five-year contract. The vice-president followed such directions and, after crossing out his signature, had the writings filed without advising the plaintiff as to what he had done. Thereafter, the plaintiff, without intending to waive any rights it had under the oral agreement unless it could negotiate a contract with the new management of the defendant, had discussions with representatives of the defendant but no agreement was reached and, after that, the defendant let the contract to one of plaintiff's competitors. The plaintiff first learned late in December 1948 that the vice-president of the defendant had signed the writings which embodied the oral agreement and did not see them until December 31st in that year. This suit was commenced on January 7, 1949.

As the findings, above summarized, are adequately supported by substantial evidence they are controlling and establish that a comprehensive oral contract was actually entered into by the parties which they intended to be binding as of June 7, 1948 and to be performed beginning January 1, 1949.

The next question is whether that oral contract is enforceable. It involved many thousands of dollars and was not to be performed within a year. Under the Statute of Frauds of either the State of New York[1] or the State of Connecticut[2] no suit can be maintained upon such a contract unless it can be proved by a written memorandum thereof signed by the party to be charged. As the result is the same under the statute in each state we do not think it necessary to decide which does apply. But this court would, if decision were required, apply the rule of conflict of laws of New York. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477. That apparently would require the application of the Connecticut statute. See Franklin Sugar Refining Co. v. Lipowicz, 247 N.Y. 465, 160 N.E. 916, 59 A.L.R. 1414, and Wolfe v. Wallingford Bank & Trust Co., 124 Conn. 507, 1 A.2d 146, 117 A.L.R. 932.

The decisive question is whether the writing signed by the vice-president of the defendant is admissible proof of the oral contract. It did not expressly refer to the oral agreement and it has, indeed, been held that such a recital is essential to satisfy the statute. Lowther v. Potter, D.C., 197 F. 196, affirmed 6 Cir., 221 F. 881, But we think this view loses sight of the fact that the statute is silent as to any such reference. It requires only that the writing signed actually be such a memorandum of the oral contract that it shows what the contract was. An express reference in the writing serves to help show that but it is not the only evidence permissible. Surely another writing signed by the party to be charged which identified the writing claimed to be such as a memorandum of the contract would suffice, for it is not essential that the entire memorandum be signed at the same time. Burns v. Garey, 101 Conn. 323, 125 A. 467; Charlton v. Columbia Real Estate Co., 67 N.J.Eq. 629, 60 A. 192, 69 L.R.A. 394. In this instance

---

1. N.Y.Pers.Prop.Law, Consol.Laws, c. 41, § 31:
"Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking; (1) By its terms is not to be performed within one year from the making thereof, or the performance of which is not to be completed before the end of a lifetime * * *."

2. Conn.Gen.Stat.1949, § 8293:
"No civil action shall be maintained * * * upon any agreement that is not to be performed within one year from the making thereof, unless such agreement, or some memorandum thereof, be made in writing, and signed by the party to be charged therewith, or his agent * * *."

there was another writing signed by the authorized vice-president of the defendant addressed to his superior as follows:

"New Haven, Conn. June 7, 1948
"Mr. H. S. Palmer:

"This afternoon, Messrs. Mackay, Caley and I discussed with Mr. Jayne of Transit Advisers, and agreed to the renewal of his contract with us on a basis of five years and at terms agreeable to all concerned.

"J. F. Doolan"

Thus the record on this appeal shows by a written memorandum signed by the party to be charged that complete agreement was reached on June 7th. Though we do not mean to hold that, absent such a writing, the August 9th memorandum would not have been sufficient to take the oral agreement out of the statute, when it was shown by oral proof to be but a reduction of the June 7th agreement to writing, we have no hesitation in reaching the conclusion that it may fairly be inferred, no material changes in the June 7th agreement having been proved to have been made meanwhile, that the writing of August 9th conformed to the agreement of June 7th mentioned in the memorandum of that date.

■ Nor can the defendant's contention be sustained that the writing was made ineffective as a memorandum of the oral agreement by the crossing out of its vice-president's signature after it had been affixed. The signature was intended to signify his approval of it, with complete understanding of the nature and contents of the document being signed, as a memorandum of the previous oral agreement. As soon as he did sign under such circumstances, written evidence of the oral contract came into existence which took that contract out of the statute of frauds. Handy v. Barclay, 98 Conn. 290, 119 A. 227. Subsequent cancellation of the signature was but evidence that the oral contract of which the writing was a memorandum had been repudiated but it did not alter the fact that a memorandum had been signed which, when signed, made the statute of frauds inapplicable to the previous oral contract. It was as effective as evidence that the previous oral contract had been made and indicative of the terms of that contract after the signature was crossed out as it was before. See Poel v. Brunswick-Balke-Collender Co. of N. Y., 159 App.Div. 365, 144 N.Y.S. 725, reversed on other grounds 216 N.Y. 310, 110 N.E. 619. Of course, if the memorandum had been signed by mistake cancellation of the signature would present a different situation.

■ Delivery of the signed memorandum is not necessary to make it effective as evidence of the previous oral contract unless, by its terms, the oral contract is not to be consummated until a memorandum has been delivered. Absent that condition upon the binding effect of the oral contract, non-delivery does not affect the probative value of the signed memorandum to satisfy the requirements of the statute of frauds. Gall v. Brashier, 10 Cir., 169 F.2d 704, 12 A.L.R. 2d 500; Charlton v. Columbia Real Estate Co., supra, 2 Williston Contracts, Sec. 579A (Rev. Ed. 1936). See Jacobson v. Hendricks, 83 Conn. 120, 75 A. 85.

We find no error in the judgment declaring the oral contract valid and enforceable.

The plaintiff's appeal raises the inadequacy of the amount of the judgment and in dealing with that it is necessary to describe the method used in computing the damages. The court selected 1948 as a typical year of operation under the previous contract between the parties and calculated the percentage of gross revenue which was net profit to the plaintiff in that year. This was done by deducting from the total advertising sales revenue received under the contract, $199,378.50, the amount paid to the defendant as its share, $118,261.38, and the amount of the plaintiff's total expenses allocable to the contract, $69,074.35. The net profit arrived at was $12,042.77 which is approximately 6% of the gross revenue received. This percentage return was then applied to the estimated yearly gross revenue which would have been realized had the contract here involved been performed, $275,000, and from the resultant figure, $82,500 the court deducted what it described as a "Due allowance * * * for the fixation of a present-day cash value on the probable earnings on this contract for a 5-year period, for business conditions of this future period, for increased costs of

carrying the contract, for the fact that no further executive supervision is required and for the many contingencies and uncertainties of the future inherent both in the contract and human affairs," and entered a judgment for the plaintiff for $56,875 with interest from the date of the filing of the complaint.[3]

While the plaintiff does not question the approach adopted, it argues that the court erred: (1) in its estimate of the future yearly gross revenue during the period of the contract; (2) in including portions of general overhead expense in the expenses allocable to the New Haven franchise in 1948; and (3) in failing to take account of an item of $12,000.00 which the defendant agreed to pay yearly as its portion of the cost of maintaining advertising display units.

■ The basis for the first contention is that the determination was not supported by the evidence. With this we cannot agree. The court had before it evidence of gross revenue received in 1948; the experience of the plaintiff's competitor, during 1949 and part of 1950, in connection with the New Haven franchise; the estimate of the president of the plaintiff and of its competitor. The disparity between the amounts so indicated by this evidence ranged from $199,378.50 to $333,076. In view of this disparity, we cannot say that the court was clearly in error in deciding that $275,000 was the expectable amount of yearly earnings during the contract period.

■ As to the plaintiff's second contention, that it was improper to allocate general overhead expenses to the New Haven franchise in computing the net profit realized by the plaintiff in 1948, we think there was no error. The plaintiff insists that

these expenses[4] were necessary whether or not it had the New Haven franchise. If the plaintiff was not relieved of these expenditures by the breach, the argument continues, there is no basis for including them in the computations to determine the plaintiff's damages. Barnebey v. Barron G. Collier, Inc., 8 Cir., 65 F.2d 864; F. A. Bartlett Tree Expert Co. v. Hartney, 308 Mass. 407, 32 N.E.2d 237. Though we agree, in principle, with this argument, it is not applicable to a case where, as here, the amount of damages cannot be determined directly, i. e., by subtracting from the known contract price the known cost of performance and get a resultant figure which represents the loss caused by the breach. The court here was faced with a complex situation in which none of these factors could be shown with any high degree of exactitude and, hence, adopted the expedient of projecting the plaintiff's experience in past operations under very similar circumstances into the future. It was concerned with the rate of return the plaintiff realized from the gross revenue received through these operations since this could be applied to what was proved would have been the probable future gross revenue from its operations. However, to have deducted from this gross revenue only those direct expenses incidental to producing this revenue would have been to overlook the nature of the plaintiff's business which was, in fact, a large enterprise handling over 15 franchises similar to the New Haven one, employed 53 display men, 8 supervisors, 6 to 8 salesmen, plus an administrative complement of executive and office personnel. While the expenses necessary to operate its offices and to pay its executive personnel, who, of course, were concerned with the enterprise

---

3. The following is a graphic description of what the court did:

| | |
|---|---|
| Total 1948 Advertising Revenue from New Haven Franchise..... | $199,378.50 |
| Less share of above paid to New Haven ........................... | 118,261.38 |
| Transit's share of Advertising Revenue in 1948 ................. | 81,117.12 |
| Transit's expenses in performing New Haven Franchise in 1948... | 69,074.35 |
| Transit's 1948 Net Operating profit on New Haven Franchise....... | 12,042.77 |

| | |
|---|---|
| Percentage return to Transit on total advertising revenue from New Haven Franchise in 1948.. | 6% |
| Estimated yearly total advertising revenue from New Haven Franchise for years 1949–1953.... | 275,000.00 |
| Estimated loss of profits for five years, less amount for contingencies ........................... | 56,875.00 |

4. The items involved include certain executive and supervisory employees' salaries, office rent, light bills, etc.

as a whole, cannot be shown to have been directly incurred for the purpose of servicing the New Haven franchise, nevertheless, it is entirely proper to assume that these facilities, and work of these personnel were applied in part to this franchise and, but for it, would have been available for other income producing work. Consequently, the allocation of such expenses was necessary to reflect the plaintiff's profit under the contract. Finally, at the very least, we cannot say that it was unreasonable for the court to conclude that some part of these expenses were incurred to earn the revenue received.

 The last [5] contention of the plaintiff relates to the alleged failure of the court to include in its computations an item of $12,000.00 payable yearly by the defendant to the plaintiff.[6] This item should have been included either as an additional element of income or as a reduction of the plaintiff's expenses, either treatment having the same end result under the method adopted for computing damages. However, whether it was so included is not at all clear from the record. The error, if there be one, resulted from the fact that the exhibit from which the court obtained the amount of gross revenue realized in 1948, $199,378.50, listed as a separate item, after this figure and as an additional item of income, the $12,000. Also, the exhibits from which the court derived the plaintiff's expenses did not take account of this item. Consequently, it may be that it was inadvertently omitted. However, we cannot say for certain that it was since it may have been included without specific reference to it. For example, in connection with the dispute over the amount of expenses allocable to the New Haven franchise in 1948, the plaintiff claimed that only $42,363.72

was proper while the defendant asserted that $95,702.38 should be so allocated. The court ultimately attributed $69,074.35 to the franchise and, in so resolving this dispute, may have taken into account the $12,-000. On this one point only a remand is therefore necessary for a definite finding to clarify this issue and, if it has not already been done, to give proper effect to the $12,000 item in the award of damages.

Judgment affirmed except as to the amount of damages and cause remanded for the entry of a judgment for an amount recomputed, if necessary, in accordance with this opinion.

---

5. The plaintiff also questions the correctness of the court in discounting its own computation of damages for unforeseen future contingencies. We think, however, that it was not unreasonable to do so. It also contends that it was error to include the salaries of two individuals in computing expenses but, since the amount involved is negligible and this not a proceeding for an accounting, we accept the court's determination without discussion.

6. This was payable under the following provision of the contract: "The Railroad company shall pay to the Advertising Company the sum of One Thousand Dollars ($1,000) per month as its proportion of the expense incurred by the Advertising Company in connection with the maintenance of advertising display units. * * * "

Both the old and the new contracts were to the same effect.